UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROSA CAMPBELL,

     Plaintiff,

v.                                Case No: 6:24-cv-1566-JSS-RMN

PAUL DEERING and REPUBLICAN
EXECUTIVE COMMITTEE OF
VOLUSIA COUNTY,

     Defendants.

_____/

## **ORDER**

Plaintiff, Rosa Campbell, proceeding pro se, and Defendant Paul Deering have filed cross-motions for summary judgment, (*see* Dkts. 107, 108), which are opposed, (*see* Dkts. 113, 117). (*See also* Dkts. 109, 110.) Upon consideration, for the reasons outlined below, the court denies the motions.

### **FACTS**

This case arises from Deering's decision to remove Campbell from a meeting. The parties agree that on June 25, 2024, the Republican Executive Committee of Volusia County (RECVC), a local political organization, held a meeting at Father Lopez Catholic High School in Daytona Beach, Florida, to hear from candidates for public office and to vote on which candidates to endorse. (Dkt. 15 at 3; Dkt. 42 at 2.) Deering ran the meeting as the RECVC chairman, and Campbell attended as an RECVC committeewoman to vote on endorsements. (Dkt. 15 at 3; Dkt. 42 at 2.)

While candidates spoke at a podium in the school's gymnasium, Campbell videorecorded their speeches with her cell phone. (Dkt. 15 at 3; Dkt. 42 at 2.)

According to Deering, the following events ensued. (*See, e.g.*, Dkt. 107-1.) Approximately halfway through the meeting, an RECVC sergeant-at-arms and the RECVC parliamentarian alerted Deering to Campbell's videorecording, at which point Deering told this sergeant-at-arms to ask Campbell to stop recording. (*Id.* at 6.) Deering asserts that RECVC meetings are private, not public. (Dkt. 117-19 at 3–4.) In an affidavit, he explains that to control the publication of members' pollical affiliations and to ensure that comments made by officials during meetings are not shared out of context, the RECVC authorizes "[o]nly certain individuals" to videorecord its meetings, in accordance with Robert's Rules of Order. (Dkt. 107-1 at 5.) This group of authorized videorecorders includes Deering as the chairman, the RECVC communications chair, the state committeeman, the state committeewoman, the appointee of the Speaker of the Florida House of Representatives, "elected public officials or their staff," "members of the Republican Party of Florida residing in Volusia County as of June 25, 2024," and "any special exceptions authorized" by Deering as the chairman, but it excludes Campbell. (*Id.*) However, Deering's discovery responses reflect that "no video[]recording by members or guests is allowed" at RECVC meetings, (Dkt. 117-19 at 4 (emphasis omitted)), although no sign prohibiting videorecording was posted at the June 2024 meeting, (Dkt. 117-15 at 3, 7; Dkt. 117-18 at 6). (*See also* Dkt. 117-2 at 4 (the meeting's official minutes, which state: "Deering advised [that] the meeting [wa]s not public. The meetings are not to be

recorded or videotaped period."); Dkt. 117-7 at 2 (an affidavit by an attendee repeating these statements).)  The discovery responses also reflect that the RECVC lacked a "reasonable method to vet [its] membership or guests" to the standard of videorecording held by the communications chair, a "former career newsman." (Dkt. 117-19 at 4 (emphasis omitted).)  Given Campbell's allegedly unauthorized videorecording, the sergeant-at-arms twice asked her to stop recording. (Dkt. 107-1 at 6.)  When she did not, (*see* Dkt. 117-18 at 5), Deering approached Campbell and requested that she stop.  (Dkt. 107-1 at 6–7.)

As Deering describes events, he warned Campbell that if she did not stop after three requests, he would have her removed for disrupting the meeting.  (*Id.* at 7.)  He made three requests, which she disregarded.  (*Id.*; Dkt. 117-19 at 5.)  Deering confirmed with the parliamentarian that he had the authority under Robert's Rules of Order to remove Campbell from the meeting.  (Dkt. 107-1 at 7.)  Although Deering announced to the meeting's attendees that a member had been recording despite multiple requests to stop, (*id.*), Deering did not raise Campbell's removal from the meeting as an issue for debate, (Dkt. 117-18 at 3).  There was no motion made or vote taken to remove Campbell.  (*Id.*; Dkt. 117-15 at 2, 7; Dkt. 117-16 at 3.)  Deering simply told Campbell to leave, instructing the sergeant-at-arms to escort her out of the building.  (Dkt. 107-1 at 7.)  After Campbell refused to get out of her seat, Deering cautioned her that if she did not leave, he would ask law enforcement to remove her.  (*Id.*)  She remained seated.  (*Id.*)  Deering allegedly did not hear Campbell make a motion, (*but see* Dkt. 117-15 at 3, 8–9); however, he heard her complain that other

attendees were "doing the same thing"—presumably, videorecording—and that she was being unfairly "singled out." (Dkt. 117-19 at 3.) These complaints notwithstanding, Deering asked a deputy present at the meeting to escort Campbell out of the building, and she was removed. (Dkt. 107-1 at 7.) Her remaining ballots were collected as she left the building with the deputy. (*Id.* at 8.) Campbell had voted on six of ten total endorsements before she left, but she could not vote on the remaining endorsements. (Dkt. 117-19 at 2.) The meeting continued after her removal. (Dkt. 107-1 at 7.) Following the meeting, another sergeant-at-arms told Deering that Campbell had been reminded prior to the meeting that she could not videorecord during the meeting. (*Id.*)

Campbell relates events differently. (*See, e.g.*, Dkt. 15.) According to her, after Deering told her to put down her cell phone, to stop recording, she emphasized the public nature of the meeting, and Deering responded that the meeting was private, not public. (*Id.* at 3.) The meeting had over three hundred attendees, including non-members of the RECVC. (*Id.*; Dkt. 117-15 at 3, 9.) Many other attendees were using electronic devices to take photographs and to record candidates during the meeting. (Dkt. 15 at 3.) Nonetheless, after Deering told Campbell to put down her cell phone, she complied. (*Id.*) This account aligns with Deering's discovery responses, which indicate that at previous RECVC meetings, Campbell would stop videorecording whenever asked to do so. (Dkt. 117-18 at 4; Dkt. 117-19 at 4.) Despite Campbell's compliance, Deering still asked for a sergeant-at-arms. (Dkt. 15 at 3.) Campbell stood and raised her hand to be heard. (*Id.*) Deering ignored her. (*Id.*) Campbell announced

that she was making a motion. (*Id.*) Deering said, "No." (*Id.*) Campbell made another motion, followed by another denial. (*Id.*; *see* Dkt. 117-15 at 3, 8–9.) Deering's treatment of Campbell in this regard contrasted with his treatment of another RECVC member earlier in the meeting insofar as Deering recognized that member's motion and presented the motion for a vote. (Dkt. 117-15 at 3–4, 10–11.) Following the denials of Campbell's motions, Deering immediately called on a deputy to remove Campbell from the meeting, and Campbell's remaining ballots were collected such that she could not vote on the remaining endorsements. (Dkt. 15 at 4.) The meeting's official minutes—which were filed with the Republican Party of Florida, as required— did not report that Campbell was removed by the deputy at Deering's request. (Dkt. 117-15 at 3–4, 10, 12.) Campbell states that she "had been the only female who was wearing . . . [d]readlocks and person of color, or so-called black, who was attending the meeting on the day in question." (Dkt. 15 at 4.) Deering did not remove the individuals outside her race who were using their cell phones to take photographs and videos of the candidates' speeches. (*Id.*) Indeed, Campbell was the only member removed from the meeting; after Campbell was removed, all other attendees remained in the building for the meeting. (Dkt. 117-15 at 4, 11, 13.)

Echoing Campbell's account, Stephen Shives, an attendee of the June 2024 meeting, reports: "I am not and have never been a member of the [RECVC]. I attended [the meeting] with numerous others [who] were not members. I was never informed [that the meeting] was not open to the public[.] I also observed several people recording video on their phones during the meeting." (Dkt. 117-11 at 2.) Similarly,

Katelyn Kardell, another RECVC non-member present for the meeting, states that she attended with her family, observed the meeting in its entirety, and took photographs and videos during the meeting "without being instructed to leave." (Dkt. 117-9 at 2.) In addition, attendee Karen Clark Kozlik admits to recording a candidate during the meeting and notes that "many others" were also recording. (Dkt. 117-6 at 2.) Clark Kozlik further indicates that Campbell was not told while signing in to the meeting that videorecording was prohibited. (*Id.*)

Peter Kouracos, an RECVC committeeman who attended the June 2024 meeting, declares the following regarding the meeting. (*See* Dkt. 117-10.) Deering demanded that Campbell "vacate the building"; otherwise, she would "be forcibly removed by law enforcement." (*Id.* at 3.) When Deering made this demand, Kouracos could not see a phone in Campbell's hands, and in fact, Kouracos "did not see any use of a phone" by Campbell. (*Id.*) In any event, it would have been common for RECVC members to use their phones to record the meeting: the Republican Party of Florida Rules then in effect did not prohibit members from recording, and no restrictions on videorecording were posted or announced before or during the meeting. (*Id.* at 3–4.) At no point did Deering permit members to object to Campbell's removal from the meeting. (*Id.* at 6.) Attendees other than Campbell used their phones to record the meeting and were not asked to leave; only Campbell was removed. (*Id.* at 4–6.) Regarding Campbell's removal, Kouracos states: "Campbell was a full member of the [RECVC] and should have been treated with full rights and privileges thereof. Any call for her removal would have required a mandatory vote of all quorum[-]present

- 6 -

membership and[,] if I recall correctly[,] a [two-thirds] vote to remove." (*Id.* at 3.) According to Kouracos, the nature of the June 2024 meeting made a vote to remove Campbell "absolutely mandatory," yet no vote occurred. (*Id.* at 4–5.) Kouracos asserts that Deering based Campbell's removal on an incorrect interpretation of a Republican Party rule. (*Id.* at 5.)

According to Douglas Pettit, another committeeman present for the June 2024 meeting, Deering generally failed to conduct the meeting in accordance with Robert's Rules of Order. (Dkt. 117-8 at 3.) This noncompliance was part of a pattern for Deering. (*See id.* at 3, 5–6.) Deering had told Pettit that in an effort to keep meetings moving smoothly, Deering did not follow Robert's Rules of Order. (*Id.* at 5–6.) Accordingly, Deering regularly "failed to call on members and ignored members attempting to introduce motions to the floor." (*Id.* at 5.) Earlier on in the June 2024 meeting, before Campbell's removal, she had raised her hand, and Deering had called on her. (*Id.* at 3.) However, she later "attempted to speak again," and Deering "refused to call on her, instead directing her to cease video[]recording the meeting." (*Id.*) Deering "made a general statement about not recording the meeting" and then told Campbell to "cease recording on her phone." (*Id.*) She objected, and Deering stated that if she did not stop videorecording, she would need to leave the meeting. (*Id.*) Deering, alone, decided to remove Campbell; there was no vote to remove her. (*Id.* at 4.) During the ensuing exchange between Deering and Campbell, two sergeants-at-arms approached Campbell's location and "attempted to get her to

comply." (*Id.* at 3.)  Pettit states that "[a]fter further objection and failure to comply with . . . Deering's instructions, . . . Deering instructed . . . Campbell to leave the meeting and made it clear through word and action that a Volusia County [d]eputy was present to enforce his order." (*Id.*)  Although objections to Campbell's removal arose in the form of "random outbursts," Deering did not publicly address the objections but asserted his "authority to remove anyone not complying with his decision of conduct." (*Id.* at 5.)  Despite the presence of the sergeants-at-arms and the deputy, Pettit claims that Campbell "eventually left on her own." (*Id.* at 4.)  During the meeting, Pettit "observed random others in the audience with phones out as if taking pictures or videos." (*Id.* at 3, 5.)  Nonetheless, to his knowledge, no other attendees were removed from the meeting.  (*Id.* at 5.)  Also, according to Pettit, RECVC non-members attended the meeting, but at some point, Deering told the non-members to leave.  (*Id.* at 4.)

The parties agree that years before the June 2024 meeting, Deering referred to Campbell as "our token black" during another meeting.  (Dkt. 15 at 4–5; Dkt. 107-1 at 1–2.)  According to Campbell, Deering "made [the] racial slur in singling [her] out" while highlighting the ethnic composition of members.  (Dkt. 15 at 4.)  Deering stated: "[W]e have our Latino, our White[,] and our 'token black.'" (*Id.* at 4–5.)  Deering pointed at Campbell when he came to that last label.  (*Id.*)  Campbell responded: "I [am] no token black nor token anything." (*Id.* at 5.)  Clark Kozlik heard Deering's remark to Campbell and states that the remark was made at a February 11, 2018 meeting of the Republican Club of Deltona.  (Dkt. 117-13 at 2.)  According to Clark

Kozlik, she and Campbell met with other individuals at a theater in Deltona, Florida, to start a local Republican organization, and Deering was present to provide information about the rules for accomplishing this purpose. (*Id.*) Clark Kozlik reports that after Deering introduced himself to the group as an RECVC liaison, he stated— "with a smile"—that it "was nice to see a group of minorities," and then he pointed at Campbell and stated: "[H]ere we have our token black." (*Id.* (emphasis omitted).) According to Clark Kozlik, the remark shocked Campbell. (*Id.*)

Deering does not dispute that he referred to Campbell as "our token black" or that Campbell rejected the label. (Dkt. 107-1 at 2.) However, he adds details to contextualize the remark. According to Deering, he made the remark during a January 11, 2018 meeting in Deltona, Florida. (*Id.* at 1.) He had known Campbell since 2015 and had invited her to join the Republican Club of West Volusia in that same year. (*Id.* at 2.) During the January 2018 meeting, Deering asked attendees to introduce themselves, but he introduced individuals whom he already knew, including Campbell. (*Id.*) Intending the remark as a joke rather than a racial slur, Deering made it in a lighthearted tone. (*Id.*) He expected Campbell to laugh but "misjudged both the moment and the tone of" his relationship with her. (*Id.*) Before he could finish talking, Campbell interjected: "I [am] not a token anything." (*Id.*) Deering acknowledges that Campbell seemed genuinely offended by his remark. (*Id.*) He spoke with her after the meeting and apologized multiple times. (*Id.* at 2–3.) Given Campbell's friendly and joking nature, Deering was shocked that she considered his

remark "belittling or hurtful." (*Id.* at 3.)  Before Campbell exited the room where the meeting had been held, she told Deering: "I accept your apology."  (*Id.*)

In addition to describing the 2018 and 2024 meetings, Deering discusses two intervening meetings at which he had disruptive attendees outside Campbell's race removed.  (*See id.* at 3–5.)  According to Deering, during the membership report portion of a spring 2022 meeting, the RECVC membership chairman "announced the names of fifteen" of forty total "applicants who were present and scheduled to be voted on that evening."  (*Id.* at 3.)  A man outside Campbell's race—an applicant whose name had not been announced—asked why it had not been, and the membership chairman explained to the man that given time constraints, the remaining applicants would be "brought forward for a vote at a future meeting."  (*Id.* at 3–4.)  "[D]issatisfied with this explanation," the man "demanded to be included in the vote that night," prompting Deering to explain "the established process and the limitations of the agenda" and to advise the man that Deering would speak with him after the meeting.  (*Id.* at 4.)  Three times, Deering asked the man to take a seat so the meeting could resume, and each time, the man refused, continuing to argue.  (*Id.*)  Deering warned the man that Deering would have a sergeant-at-arms remove him from the meeting, and when the man continued to argue, Deering instructed a sergeant-at-arms accordingly.  (*Id.*)  At that point, the man left unaccompanied by the sergeant-at-arms.  (*Id.*)  Further, Deering states, during a November 2023 meeting at Father Lopez Catholic High School, a member outside Campbell's race "stood up without recognition and began verbally berating" the RECVC.  (*Id.*)  Deering asked the

member to sit, indicating that the member's concerns would be addressed at the proper time on the agenda, but the member refused. (*Id.*) After another request to sit, the member "direct[ed] an explicit profanity toward" Deering. (*Id.*) Deering told the member to leave and informed him that if he did not, Deering would have a sergeant-at-arms remove him. (*Id.* at 4–5.) "Before the sergeant-at-arms could reach" the member, the member "raised his arms and began walking toward the exit, continuing to curse loudly." (*Id.* at 5.)

## PROCEDURAL HISTORY

Campbell claims that Deering had her removed from the June 2024 meeting because of her race. (Dkt. 15 at 1.) Consequently, she initiated this action in September 2024 suing Deering, the RECVC, and unidentified others for race discrimination and constitutional violations. (*See* Dkt. 1.) Deering and the RECVC moved to dismiss the initial complaint arguing that three major pleading deficiencies— the failure to set out distinct causes of action in separate counts, the failure to specify the misconduct allegedly committed by each Defendant, and the overall vague and conclusory nature of the allegations—rendered the initial complaint an impermissible shotgun pleading. (*See* Dkt. 10.) In response to the motion to dismiss, Campbell amended her complaint to drop the unidentified Defendants and to add details about Defendants' alleged misconduct. (*See* Dkt. 13.) Three days later, Campbell filed the operative verified second amended complaint, which proceeds under 42 U.S.C. § 1981. (*See* Dkt. 15; *see also* Dkt. 20 (the court's order accepting the second amended

complaint as the operative pleading in this case).)

Deering and the RECVC moved to dismiss the second amended complaint for failure to state a claim. (*See* Dkt. 19.) In their view, the section 1981 claims fail because Campbell asserts a contractual relationship based on the RECVC membership oath, which unlike the organization's constitution and by-laws, cannot amount to a contract. (*See id.*) The magistrate judge assigned to this case recommended denying the motion to dismiss, as the second amended complaint plausibly alleges a contractual relationship based on Campbell's membership in the RECVC. (*See* Dkt. 37.) Deering and the RECVC objected to the magistrate judge's recommendation, (*see* Dkt. 39), and Campbell responded in opposition to the objections, (*see* Dkt. 40). The court overruled the objections, adopted the recommendation, and denied the motion to dismiss. (*See* Dkt. 41.) The court explained:

> When the court considers the entirety of the second amended complaint, construes it liberally, accepts its facts as true, and draws all reasonable inferences in [Campbell]'s favor, [Campbell] sufficiently identifies the impaired contractual relationship as arising from membership in the [RECVC]. [The pending] objections notwithstanding, the second amended complaint's reference to the membership oath for the [RECVC] rather than to the constitution and by-laws does not require dismissal because when the court construes the complaint liberally, it concludes that in essence, [Campbell] uses the oath as shorthand for the obligations arising from [RECVC] membership, which are contractual in nature as set by the constitution and by-laws.

(*Id.* at 8 (citations omitted).)

After the denial of the motion to dismiss the second amended complaint, Defendants submitted an answer denying liability and raising affirmative defenses. (*See* Dkt. 42.) Campbell then moved for a judgment on the pleadings, (*see* Dkt. 43),

and the court denied the motion because the answer denies Deering's intentional race discrimination against Campbell, (*see* Dkt. 47). On November 19, 2025, the magistrate judge permitted the RECVC's counsel to withdraw, afforded the RECVC a month to acquire new counsel, and cautioned the RECVC that its failure to acquire new counsel could lead to the entry of default against it. (*See* Dkt. 93.) After the RECVC failed to acquire new counsel, the magistrate judge directed the Clerk to enter default accordingly. (*See* Dkts. 103, 105, 106.) Discovery in this case closed on January 5, 2026. (Dkt. 25 at 1.) Thereafter, the instant cross-motions for summary judgment were filed. (*See* Dkts. 107, 108.) This case is set for trial during the term starting on July 6, 2026. (Dkt. 119 at 1.)

## APPLICABLE STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a party "assert[s] that a fact cannot be or is genuinely disputed," the party "must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . [by] showing that the materials cited do not establish the absence or presence of a genuine dispute[] or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials" when resolving the motion. Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record."

(quotation omitted)).

A factual dispute is "genuine" only if "a reasonable [factfinder] could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that no evidence supports the non-moving party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor.

*Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

Although courts "give liberal construction" to pro se filings, *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007), pro se parties are still "required . . . to conform to procedural rules," *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002). *See Cummings v. Dep't of Corr.*, 757 F.3d 1228, 1234 n.10 (11th Cir. 2014) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law." (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981))). The leniency with which courts treat pro se parties does not permit courts to "serve as de facto counsel" or "rewrite an otherwise deficient pleading." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998).

## ANALYSIS

In his motion, Deering advances two arguments that he is entitled to summary judgment on the section 1981 claim against him. (Dkt. 107 at 18–23.) First, Deering asserts that no evidence supports his intent to discriminate against Campbell based on her race. (*Id.* at 21–22.) Second, Deering repeats his previous contention that an oath does not constitute a contract under the statute. (*Id.* at 18–21.) In his response to Campbell's motion, Deering cursorily adds to these arguments that the affidavits

- 15 -

submitted in support of Campbell's motion do not state facts based on the affiants' personal knowledge.  (Dkt. 113 at 12.)  For her part, Campbell contends that she is entitled to summary judgment on all her claims because Deering—and by extension the RECVC, of which he was the chairman—engaged in race-based disparate treatment by removing her from the June 2024 meeting but not removing similarly situated attendees outside her race who were also videorecording.  (Dkt. 108 at 7–14.) In setting forth her position, Campbell maintains that the meeting was open to the public and thus subject to recording under the law and that Deering lacked the authority to remove her from the meeting without a motion or a vote under Robert's Rules of Order.  (*Id.*)  In her response to Deering's motion, Campbell notes Deering's admission of the previous "token black" remark, which shows that prior to the June 2024 meeting, Deering singled out Campbell based on her race during the meeting of a local Republican organization and which, therefore, arguably establishes a pattern of Deering's intentional race discrimination against Campbell.  (Dkt. 117 at 11–12.)

To the extent that Campbell seeks summary judgment as to her section 1981 claim against the RECVC, which has defaulted, (*see* Dkt. 106), the court denies Campbell's motion without prejudice to her filing a motion for default judgment as to the RECVC after the ultimate resolution of her claim against Deering in this case.  *See Great Am. Ins. Co. v. Delphini Constr. Co.*, No. 6:14-cv-1412-Orl-41DAB, 2015 WL 13791707, at \*2, 2015 U.S. Dist. LEXIS 194615, at \*5 (M.D. Fla. Sept. 28, 2015) ("The appropriate procedure against a defendant in default is a motion for default judgment, not a motion for summary judgment.").  With respect to Campbell's section

1981 claim against Deering, genuine disputes of material fact preclude summary judgment for either party. *See* Fed. R. Civ. P. 56(a).

The court has considered Deering's argument that Campbell's evidence does not set out facts based on personal knowledge, (Dkt. 113 at 12), and it finds the argument unpersuasive. "[E]vidence which can be reduced to an admissible form" at trial may support a summary judgment motion. *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). For example, an "affidavit 'can be reduced to admissible form at trial' by calling the affiant as a witness." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)). Deering does not explain why the individuals who provided the statements that Campbell used to support her motion could not be called as witnesses at trial. (*See* Dkt. 113 at 12.) Further, these statements demonstrate that the individuals were present at the meetings described, and Deering does not explain why the individuals' presence could not establish personal knowledge. (*See id.*) *See* Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony."); *Poitevint v. United Recovery Sys., LP*, 899 F. Supp. 2d 1230, 1235 (N.D. Fla. 2012) ("For a matter to be considered within a witness's personal knowledge, it must be derived from the exercise of [the witness's] own senses, . . . founded on personal observation." (quotations omitted)). In light of all the evidence submitted by the parties, summary judgment is inappropriate.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every [s]tate . . . to make and enforce

contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute defines making and enforcing contracts as encompassing "the making, performance, modification, and termination of contracts," as well as "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). A section 1981 claim has three elements: (1) "the plaintiff is a member of a racial minority," (2) "the defendant intended to discriminate on the basis of race," and (3) "the discrimination concerned one or more of the activities enumerated" in section 1981. *Lopez v. Target Corp.*, 676 F.3d 1230, 1233 (11th Cir. 2012) (quotation omitted). For summary judgment purposes, Deering does not dispute the first element, (*see* Dkts. 107, 113), and evidence such as Campbell's verified second amended complaint supports this element, (*see* Dkt. 15 at 4–5). *See Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) ("[A] verified complaint serves as the equivalent of an affidavit for purposes of summary judgment[.]").

With respect to the second element, "[t]o establish intentional racial discrimination, [a section 1981 plaintiff] may rely on either direct . . . or circumstantial evidence." *Melton v. I-10 Truck Ctr. Inc.*, 166 F.4th 905, 913 (11th Cir. 2026). If the plaintiff proffers direct evidence, the court cannot grant summary judgment for the defendant. *Id.* In the case of circumstantial evidence, the court "generally appl[ies] the *McDonnell Douglas* burden-shifting framework." *Id.* (quotation omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Indeed, Deering invites the court to employ this framework. (*See* Dkt. 107 at 17–18, 21–22.) Even without this framework, a section 1981 plaintiff "may always prove a claim of discrimination

by presenting sufficient evidence that would permit a reasonable factfinder to find that the [defendant] discriminated against" the plaintiff. *Melton*, 166 F.4th at 913 (alterations adopted and quotation omitted). "To constitute direct evidence, a remark must indicate that *the . . . decision in question* was motivated by race." *Id.* at 914 (quotation omitted). Given the remoteness in time between the 2018 and 2024 meetings, a span of more than six years, the "token black" remark that Deering undisputedly directed at Campbell in 2018 is not direct evidence that his decision to remove her from the 2024 meeting was motivated by race. *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998) (explaining that "comments are not *direct* evidence of discrimination" when they are "too remote in time"). Because Campbell presents circumstantial evidence of discrimination, the court accepts Deering's invitation to apply the burden-shifting framework. *See Melton*, 166 F.4th at 913.

"Under that framework[,] the plaintiff must first establish a prima facie case of discrimination, typically by showing that she was a . . . member of a protected class and was subjected to an adverse . . . action in contrast to similarly situated [individuals] outside the protected class." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). "Once the plaintiff has made a prima facie case," the summary judgment analysis incorporates "a rebuttable presumption . . . that the [defendant] has acted illegally." *Id.* Here, evidence supports that Campbell was a member of a racial minority, (*e.g.*, Dkt. 15 at 4–5), and that she was subjected to an adverse action when Deering had her removed from the June 2024 meeting, (*e.g.*, *id.* at 4; Dkt. 107-1 at 7–8; Dkt. 117-19 at 2). However, a genuine dispute exists as to

- 19 -

whether Deering treated Campbell differently from similarly situated individuals outside her race.  In the light most favorable to Deering, he did not.

Campbell seemingly asserts that she was the only person of color among the meeting's more than three hundred attendees.  (*See* Dkt. 15 at 3–4.)  It is for the factfinder to determine the truth or falsity of this assertion.  Even if numerous attendees outside her race were videorecording, (*see id.* at 3; Dkt. 117-6 at 2; Dkt. 117-8 at 3, 5; Dkt. 117-10 at 4–6; Dkt. 117-11 at 2), RECVC policy allegedly authorizes various individuals to record, (*see* Dkt. 107-1 at 5).  Moreover, evidence supports that as the RECVC chairman, Deering was occupied with running the meeting and accordingly relied on others, namely a sergeant-at-arms and the parliamentarian, to identify potential violations of the recording policy.  (*Id.* at 6.)  In the light most favorable to Deering, once he was alerted to Campbell's unauthorized recording, he treated her as he had treated the disruptive attendees at the 2022 and 2023 meetings, who were outside her race: that is, he acted to eject her from the meeting only after he gave her the opportunity to permit the meeting to proceed.  (*See* Dkt. 107-1 at 3–5.)  Accordingly, when the court views the record in Deering's favor, Campbell does not establish a prima facie case, the presumption of discrimination does not arise, and Campbell is not entitled to summary judgment.  *See Mason v. City of Tampa*, 134 F. Supp. 2d 1309, 1314–15 (M.D. Fla. 2000) (denying the plaintiff's motion for summary judgment as to a race discrimination count because she "failed to prove the non[]existence of a genuine issue of material fact" regarding whether the defendants treated similarly situated individuals outside her race more favorably than her).

That said, in the light most favorable to Campbell, Deering treated her less favorably than he did individuals outside her race.  Evidence supports that although numerous attendees outside Campbell's race were videorecording the meeting, only Campbell was removed for recording.  (*See* Dkt. 15 at 3–4; Dkt. 117-6 at 2; Dkt. 117-8 at 3, 5; Dkt. 117-10 at 4–6; Dkt. 117-11 at 2; Dkt. 117-15 at 4, 11, 13.)  A dispute remains regarding the extent to which RECVC policy authorized attendees to record. (*See* Dkt. 107-1 at 5; Dkt. 117-2 at 4; Dkt. 117-6 at 2; Dkt. 117-7 at 2; Dkt. 117-10 at 3–4; Dkt. 117-15 at 3, 7; Dkt. 117-18 at 6; Dkt. 117-19 at 4.)  A related dispute centers on the extent to which the June 2024 meeting was open to the public.  (*See* Dkt. 15 at 3; Dkt. 117-2 at 4; Dkt. 117-7 at 2; Dkt. 117-8 at 3; Dkt. 117-9 at 2; Dkt. 117-11 at 2; Dkt. 117-15 at 3, 9; Dkt. 117-19 at 3–4.)  In any event, when the court views the record in Campbell's favor, she complied with Deering's directive to put down her phone and he still had her removed.  (*See* Dkt. 15 at 3; Dkt. 117-10 at 3.)  Campbell's history of compliance reinforces this conclusion.  (*See* Dkt. 117-18 at 4; Dkt. 117-19 at 4.) Further, a reasonable factfinder could determine that unlike the disruptive attendees at the 2022 and 2023 meetings, who interrupted proceedings by speaking out, (*see* Dkt. 107-1 at 3–5), Campbell did not interrupt proceedings by videorecording.  Rather, Deering interrupted proceedings by singling out her recording when numerous other attendees outside her race were also recording. (*See* Dkt. 117-19 at 3.)  Thus, when the court views the record in the light most favorable to Campbell, she establishes a prima facie case such that the rebuttable presumption of discrimination arises.  *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981) ("Establishment of the prima facie

case in effect creates a presumption that the [defendant] unlawfully discriminated against the [plaintiff].").

A defendant can rebut the presumption "by articulating one or more legitimate non[]discriminatory reasons" for the adverse action. *Alvarez*, 610 F.3d at 1264. Then, "the burden shifts back to the plaintiff to produce evidence that the [defendant]'s proffered reasons are a pretext for discrimination." *Id.* A plaintiff can establish pretext by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the . . . proffered legitimate reasons . . . that a reasonable fact[]finder could find them unworthy of credence." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (quotation omitted). Here, Deering contends that his decision to remove Campbell from the June 2024 meeting was motivated by her unauthorized videorecording, not her race, (*see* Dkt. 107-1 at 6–7), and the record demonstrates genuine disputes implicating this issue. Campbell is not entitled to summary judgment because a reasonable factfinder could credit Deering's reason for removing her. However, Deering is likewise not entitled to summary judgment because evidence supports that the reason is pretextual. It is for the factfinder to decide whether the meeting was open to the public, just as it is for the factfinder to identify which attendees were permitted to videorecord the meeting. *Cf. King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1261 (N.D. Ala. 2014) ("[A]s to pretext, the evidence presented by [the] plaintiff is sufficient to allow a jury in the exercise of impartial judgment to conclude that [the defendant]'s proffered explanations are unworthy of belief. Alternatively, a reasonable jury could equally conclude that [the defendant]'s

articulated reasons for firing [the plaintiff] are legitimate and not a pretext for [age] discrimination . . . .    Therefore, summary judgment is denied . . . ." (alterations adopted and quotation and emphasis omitted)).

Viewed in Campbell's favor, evidence about the RECVC policy on videorecording could support pretext.  To begin, the record demonstrates inconsistencies concerning the policy.  Although Deering's affidavit lists members and guests authorized to record meetings, (Dkt. 107-1 at 5), Deering's discovery responses indicate that "no video[]recording by members or guests is allowed" at RECVC meetings, (Dkt. 117-19 at 4 (emphasis omitted)), and the official minutes of the June 2024 meeting state: "The meetings are not to be recorded or videotaped period," (Dkt. 117-2 at 4; *accord* Dkt. 117-7 at 2).  Deering's discovery responses also suggest that the communications chair was the only individual permitted to videorecord meetings, as the communications chair set the standard for videorecording for the RECVC given his background in journalism and the RECVC lacked the means to hold others to the standard.  (*See* Dkt. 117-19 at 4.)  Evidence thus reflects an "[i]nconsistent application of [the] policy," which "may constitute circumstantial evidence of discrimination and . . . give rise to a triable issue of fact."  *Mercer v. Perdue Farms, Inc.*, No. 5:10-cv-324 (CAR), 2012 WL 39342, at *9, 2012 U.S. Dist. LEXIS 2078, at *22 (M.D. Ga. Jan. 9, 2012) (citing *Ash v. Tyson Foods, Inc.*, 129 F. App'x 529, 533 (11th Cir. 2005)).  Moreover, as stated in Deering's affidavit, the RECVC's videorecording policy authorizes "elected public officials [and] their staff" and "members of the Republican Party of Florida residing in Volusia County as of June 25, 2024," to record meetings.

- 23 -

(Dkt. 107-1 at 5.)  An attendee could belong to one of these categories in a way that is not immediately obvious.  The policy also authorized Deering to make "special exceptions."  (*Id.*)  For these reasons, a reasonable factfinder could conclude that the policy allowed for selective enforcement.  *See R&R Ground Maint., Inc. v. Ala. Power Co.*, 713 F. App'x 853, 858 (11th Cir. 2017) ("A defendant's failure to follow its own policies, as well as selective application or enforcement of its policies, can be evidence of pretext.").

Other evidence could also indicate pretext.  For example, evidence supports that Deering violated protocol by removing Campbell from the meeting without submitting her proposed removal for a vote.  (*See* Dkt. 117-8 at 3, 5–6; Dkt. 117-10 at 3–5.)  *See Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination.").  Further, although Deering's "token black" remark is not direct evidence that Campbell's removal from the meeting was discriminatory, the remark may be circumstantial evidence of Deering's tendency to single out Campbell based on her race and may thus contribute to a finding of pretext.  (*See* Dkt. 15 at 4–5; Dkt. 107-1 at 1–2.)  *See Ross*, 146 F.3d at 1292 (explaining that decisionmakers' race-related comments, in conjunction with other evidence, could lead a reasonable jury to find pretext even when the decisionmakers made the comments long before the adverse action occurred).  Because the record in the light most favorable to Campbell suggests pretext, summary judgment for Deering is improper.  *See Perkins v. US Airways*, 8 F. Supp. 2d 1343, 1356 (M.D. Fla. 1998) ("[The p]laintiff has submitted evidence, which if believed, would support a finding that [the

d]efendant's purported reasons for terminating [the p]laintiff were pretextual . . . . Thus, summary judgment . . . is denied."). A reasonable factfinder could conclude from the record that Deering intentionally discriminated against Campbell based on her race when he had her removed from the June 2024 meeting.

In addition to arguing that no evidence supports intentional race discrimination, Deering challenges Campbell's ability to satisfy the third section 1981 element. (*See* Dkt. 107 at 18–21.) Deering contends that a membership oath, like that taken by Campbell for the RECVC, does not involve the making and enforcing of contracts. (*See id.*) In other words, Deering argues, an oath is not a contract. (*See id.*) As the court previously explained, regardless of whether they refer to an oath, Campbell's section 1981 claims can be construed as concerning a contractual relationship arising out of her membership in the RECVC. (*See* Dkt. 41 at 8.) The court looks to state law for the third element of a section 1981 claim. *See, e.g.*, *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 890 (11th Cir. 2007) (applying Florida law when examining whether the plaintiff had contractual rights for her section 1981 claim); *Munnings v. FedEx Ground Package Sys., Inc.*, No. 6:07-cv-282-Orl-19KRS, 2008 WL 1744779, at *3, 2008 U.S. Dist. LEXIS 31069, at *8 (M.D. Fla. Apr. 11, 2008) (in a section 1981 case, consulting Florida law to determine whether the plaintiff had contractual rights (citing *Kinnon*)); *cf. Knight v. Palm City Millwork & Supply Co.*, 78 F. Supp. 2d 1345, 1347 (S.D. Fla. 1999) (denying a motion to dismiss section 1981 counts for failure to state a claim in the at-will employment context, and explaining that "the dispositive question is whether the state law controlling the employment relationship recognizes at-will

contracts as a species of contract" (quotation omitted)).

Under Florida law, membership in a voluntary association such as the RECVC concerns contractual rights and obligations. *See Sult v. Gilbert*, 3 So. 2d 729, 731 (Fla. 1941) ("[T]he [c]onstitution and by-laws of a voluntary [a]ssociation when subscribed or assented to by the members becomes a contract between each member and the [a]ssociation[,] and if they so provide[,] a member may be expelled for insubordination to the [a]ssociation."). In this action, evidence supports that Deering denied Campbell benefits of her contractual relationship involving the RECVC when he had her removed from the June 2024 meeting without a vote. A reasonable factfinder could conclude that this conduct deprived Campbell of benefits inherent in subjecting her removal to a vote, for example the possibility of avoiding removal—in addition to the benefit of voting on each remaining endorsement, as Campbell was required to be present to vote on endorsements. (Dkt. 15 at 4; Dkt. 117-10 at 3; Dkt. 117-19 at 2.) *See* 42 U.S.C. § 1981(a)–(b) (prohibiting race-based disparate treatment that interferes with the right to enjoy any and "all benefits . . . of the contractual relationship"); *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988) (highlighting the breadth of the statute). Because a reasonable factfinder could conclude that Deering engaged in discrimination concerning Campbell's right to make and enforce contracts, Deering is not entitled to summary judgment on the section 1981 claim against him. *Cf. West v. LQ Mgmt., LLC*, 156 F. Supp. 3d 1361 (S.D. Fla. 2015) (denying defendant hotel companies' summary judgment motions as to section 1981 claims of disparate treatment when the owner of a hotel had law enforcement remove the plaintiffs from

the hotel even though the plaintiffs had already checked in).

## CONCLUSION

Accordingly:

1. The cross-motions for summary judgment (Dkts. 107, 108) are **DENIED**.

2. Campbell may move for default judgment as to the RECVC after the ultimate resolution of her section 1981 claim against Deering.

**ORDERED** in Orlando, Florida, on May 13, 2026.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties